**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| THOMAS HERNANDEZ, | ) | Case No.: 1:18-cv-01271-LJO-JLT (HC) |
| Petitioner, | )<br>) | FINDINGS AND RECOMMENDATION TO |
| v. | )<br>) | DENY PETITION FOR WRIT OF HABEAS<br>CORPUS |
| DAVID BAUGHMAN, Warden, | )<br>) | [TWENTY-ONE DAY OBJECTION DEADLINE] |
| Respondent. | )<br>) | |
| | ) | |

Petitioner is currently in state prison serving a sentence of 49 years and 4 months to life for his conviction for second degree murder, assault with a firearm, discharging a firearm at an inhabited dwelling, and associated firearm enhancements. He filed the instant habeas petition challenging the conviction. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED**.

**I.      PROCEDURAL HISTORY**

On April 3, 2014, a Fresno County jury found Petitioner guilty of second degree murder as a lesser included offense, and the firearm allegations were found true, guilty of two counts of assault with a firearm, and guilty of discharging a firearm at an inhabited dwelling. People v. Hernandez, 2017 Cal. App. Unpub. LEXIS 2352, at *2-3 (Cal. Ct. App. Apr. 5, 2017). The jury found all the gang enhancements not to be true. Id. at *3.

The Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

1  DCA"). On April 5, 2017, the Fifth DCA affirmed the judgment. Id. at *69. Petitioner filed a petition

2  for review in the California Supreme Court, and the petition was denied on June 14, 2017. (Doc. 18 at

3  7.)

4          On September 12, 2018, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc.

5  1.) On November 19, 2018, Respondent filed a motion to dismiss the petition as a mixed petition

6  containing an unexhausted claim. (Doc. 11.) This Court granted the motion on February 21, 2019 and

7  directed Petitioner to file a First Amended Petition deleting the unexhausted claim or request dismissal

8  of the petition without prejudice. (Doc. 17.) On March 5, 2019, Petitioner filed a First Amended

9  Petition deleting the unexhausted claim. (Doc. 18.) Respondent filed its answer on May 6, 2019. (Doc.

10  21.) Petitioner filed a traverse on August 9, 2019. (Doc. 27.)

11  **II.**    **FACTUAL BACKGROUND**

12          The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

13
14  Several residents of the neighborhood were witnesses to the events before, during, and after defendant fatally shot the victim. They did not know either defendant or victim, and each person's testimony was fairly consistent.

15  **The house at 4469 East Nevada**

16
17  Gary Mendoza and his mother lived on East Nevada. Mendoza and his mother testified that a man known as "Shorty" lived across the street from them, at 4469 East Nevada.

18  Adrian Avina's parents also lived on East Nevada. Avina testified that a man known as "Shorty" lived at 4469 East Nevada. At trial, Avina identified a photograph of Esteban Rillo as the man who lived at that house.

19
20  Richard Rodriguez, another resident on East Nevada, testified that Esteban "Shorty" Rillo lived across the street from him, at 4469 East Nevada.

21
22  At trial, Esteban Rillo was called as a prosecution witness and was asked if he lived at 4469 East Nevada. Rillo testified that he had lived at that address but refused to answer any more questions in front of the jury, including whether he lived at that house at the time of the shooting or if he knew the victim

23  **Defendant arrives in the neighborhood**

24
25  Just before 3:00 p.m. on April 24, 2013, Danny Barrera (Barrera) was standing outside his son's house on East Bend Avenue, near the intersection of East Nevada. Barrera was socializing with his son and his son's friends. Barrera testified that a young man and a young woman were walking together on the opposite side of the street. He described the woman as Hispanic, with long braided hair, about 19 to 25 years old, and wearing black

26

27

28  ---
  [1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

clothes.

Barrera testified the couple stopped and talked to his son's neighbor, Gina Griffis (Griffis), who was standing on her front porch. Griffis testified that defendant was the man walking with the woman. Griffis knew defendant by the name of "Creeps" or "Creeper." She had seen defendant in the area on prior occasions. She did not know the woman. Defendant asked Griffis for a cigarette, and if she could give him a ride. Griffis said no to both questions. Defendant kept walking and Griffis went into her house.

Barrera testified that after the couple finished talking with Griffis, they walked past his son's house. Barrera testified that defendant (as identified by Griffis) stared at him and appeared to be very upset. At trial, Barrera demonstrated how defendant used his arms to form the letter "L." Barrera and his friends did not talk to the couple. Barrera testified defendant did not say anything, and he did not hear any yelling or arguing. The couple kept walking, and Barrera lost sight of them.

### **A car arrives at 4469 East Nevada**

Also around 3:00 p.m., Adrian Avina (Avina) was sitting in his car, which he parked in front of Shorty's house, across the street from his parents' house on East Nevada. Avina had arrived an hour earlier and realized his parents were not home. He stayed in the driver's seat of his car, listened to the radio, and did his homework.

Avina looked up from his homework and saw a brownish-yellow car arrive and park on the street in front of him. There were two men in the car and they got out of the vehicle. Both men were wearing caps.

Avina testified that one of the men in the car was Shorty. Avina did not notice where the two men went after they got out of the car. Avina returned to his homework and looked down at his books.

Gary Mendoza (Mendoza) testified he looked out his front window and saw three people standing and talking in Shorty's front yard. He did not see Shorty or recognize the men. Mendoza's mother saw two men in front of Shorty's house; one man was inside the front fence, and the other man was outside the gate. Mendoza's mother presumed one of the men was Shorty. Mendoza and his mother did not hear any arguing, yelling, or whistling.

### **The first shot**

Avina testified that about 10 minutes after the brownish-yellow car parked in front of him, he heard a gunshot and looked up. He saw two men standing inside the perimeter fence in the front yard of 4469 East Nevada. They were not the same two men from the car, and he did not know or recognize them.

The two men were about four feet apart and facing each other. One man was holding a sawed-off shotgun and wearing a red cap with white lettering. Avina later identified defendant as the gunman. The second man was later identified as Bernardo Valdez (Valdez). Avina had not seen these men before.

Avina testified defendant aimed the shotgun at Valdez's midsection. Valdez's hands had been down at his side, and he was not holding a weapon. The first shot did not hit Valdez. Avina mistakenly thought defendant had shot Valdez because when he heard the shot and looked up, Valdez turned to his right, grabbed his stomach, and fell down. Avina did not hear any arguing, yelling, or whistling before the first gunshot.

Jesus Resendiz Corona (Resendiz), another neighbor on East Nevada, was outside his

3

house and heard the first shot. He looked down the street and saw someone lying in front of a house. He did not hear any yelling, arguing, or whistling before the first shot.

Richard Rodriguez (Rodriguez) was inside his house and heard the first shot. He did not hear any yelling or arguing before then. Rodriguez looked outside and saw a man with a shotgun (defendant) standing in front of Shorty's house. Rodriguez testified the gunman also had a black backpack. Another man (Valdez) was lying face down on the ground, and his foot was twitching.

Rodriguez testified the gunman was standing outside the house's front gate, and he yelled, "'Lewis Street, this is Lewis [S]treet, dog.'" The gunman also threw up gang signs with his hands.

Mendoza and his mother heard a loud boom. His mother looked out the window and saw a man inside the fence turn and fall down in front of Shorty's house.

### The second shot

Avina testified that after the first shot was fired, Valdez was lying face down on the ground. He was moaning and his legs were slightly moving. Defendant's lips were moving, but Avina could not hear what he was saying. He took two steps toward Valdez and fired a shot into Valdez's body as he was still lying on the ground. Defendant was about two to three feet away from Valdez when he fired the second shot. Valdez stopped moving.

Resendiz testified that within seconds of hearing the first shot, he saw the gunman walk up to the victim and fire another shot into the prone victim's body.

Rodriguez similarly testified the gunman walked up to the victim and fired a shot into the victim's body. The two shots were separated by a few seconds.

Mendoza ran outside and saw the gunman holding a sawed-off shotgun. The victim was lying in front of 4469 East Nevada. Mendoza later identified defendant as the gunman, and testified that defendant was one of the three men who had been standing in front of Shorty's house just before the first shot was fired. Defendant was wearing a red hat with a "T." Mendoza did not know defendant and had never seen him before. Mendoza testified that a person with long hair and a ponytail ran away. Mendoza also saw a bunch of teenagers running on the street.

### Defendant walks toward Avina

Avina testified that after the second shot was fired, defendant shouted something and said the word "Bulldogs." Avina believed defendant was yelling at Mendoza, who was standing across the street.

Mendoza shouted at Avina to get away. Avina started his car and backed up along East Nevada, away from the shooting scene. Defendant was still standing within the perimeter fence in front of 4469 East Nevada. Defendant apparently heard Avina's engine start. Avina testified defendant looked at him, walked out of the perimeter fence area, and headed toward Avina's car. Defendant was holding the shotgun at his waist. Avina did not see him reload the weapon. Avina continued to back up his car, and defendant kept walking toward him.

Avina testified that he kept going in reverse and defendant was jogging toward his car. Avina testified that as defendant got closer to his car, defendant "[k]ind of pointed" the gun at him, but Avina was not sure if defendant raised up the gun. The gun was "toward

the car or something," down "toward the engine."

Avina backed through the intersection of East Nevada and Barton, narrowly missing other cars, and he kept going because he was afraid. Avina made a U-turn and pulled out of the neighborhood. He lost sight of defendant.

### Defendant confronts Mendoza

Mendoza stood at his front door and saw Avina drive away. Defendant turned his attention to Mendoza and walked toward him. Defendant aimed the shotgun directly at Mendoza and told him to go inside. Defendant kept walking toward Mendoza, and said he was "gonna blast me" or "'shoot [me] down.'" Defendant tried to put the shotgun in his backpack.

Mendoza went into his house and slammed the front door. He reached for his own pump action shotgun and loaded it. Mendoza opened his front door and encountered defendant on his driveway. Defendant was still holding the shotgun and aimed it at Mendoza. Mendoza raised and cocked his own shotgun. Defendant ran away and dropped his backpack.

### Defendant tries to get into Resendiz's house

Resendiz was still standing in front of his house after the second shot was fired. A neighbor told him to get inside. Resendiz went to his door and looked back. Defendant walked toward him, and Resendiz went into the house. Defendant stood at the front door and told Resendiz to open it. Resendiz was very frightened and locked the door. Defendant tried to open the door, but he gave up and left.

Rodriguez testified that after the gunman fired the second shot, he briefly went toward a house, left that house, and yelled, "'What's up, dog.'"

### Rillo walks out of 4469 East Nevada

After defendant ran away from Mendoza's house, Mendoza left his own shotgun inside and ran across the street to the victim. Mendoza was concerned that Shorty was the victim, and he wanted to help him. When he reached the front yard of Shorty's house, Mendoza realized the victim was not Shorty.

Mendoza testified he heard "a front door open," and "Shorty came running out [of] the house. I asked him, I go, 'Is this your friend,' or, you know. He goes, 'Yeah,' so I left it in Shorty's hands."

Mendoza testified that Shorty asked him "what happened. I was all, 'I don't know.'" Mendoza went back to his house, and the police and paramedics arrived at the scene.

### The police arrive at the scene

The police department received 11 calls to 911 to report the shooting.

Officers Garcia and Mendes responded to East Nevada and found Valdez lying face down in a pool of blood, inside the gated area on a concrete walkway that led to the front door of the residence at 4469 East Nevada. His arms were crossed in front of his body. He had a single gunshot wound to his back. He was breathing but unresponsive. The scene was very chaotic and a lot of neighbors were on the street.

Officer Garcia returned to his patrol car to retrieve a medical kit. A woman approached

him, and she was frantic and upset. She was holding a black backpack. Garcia directed her to drop the backpack on the ground and to remain in the area for questioning, but she disappeared.

After Officer Garcia spoke to the woman, a man on the corner of East Nevada and Barton shouted to him that the suspect was running away.

## Defendant breaks into Marquina's house

Guadalupe Marquina (Marquina) was inside her house on East Nevada and did not hear any gunshots, arguing, yelling, or whistling. Instead, she heard the sound of a car backing up. She looked outside and recognized her neighbor's car going "too fast" in reverse.

Marquina testified that she kept looking out her window and saw the gunman cross the street to Mendoza's house. Mendoza closed his door, and the gunman headed down the street toward her house. Marquina went to the back of her house, heard someone knock over the trashcans in the alley, and saw the gunman through a side window.

Marquina testified the gunman kicked down her back door. Marquina ran to the front door and escaped into the street.

The police later determined that defendant damaged Marquina's back gate and fence, and knocked over the trashcan. He left bloody shoe prints in the yard, and a blood trail from the damaged back door, through the house, to the telephone, and out the door.

A red baseball hat with the letter "T" was found inside Marquina's house. The police later determined that Marquina's telephone had not been used to call 911 or the operator.

## Defendant confronts Herrera and her family

Annabelle Herrera (Herrera), another resident of East Nevada, was inside her house with her daughters and young grandchild. Herrera did not hear any yelling, arguing, or whistling before the gunshots were fired.

Herrera heard the gunshots and stayed inside. She looked outside and saw Mendoza and other neighbors run across the street to help the victim. Herrera saw two men walk out of the house where Valdez was lying on the concrete walkway. Mendoza shouted at Herrera to call the police and lock her doors.

About five minutes after hearing the gunshots, Herrera heard noise in her backyard. She was suddenly confronted by defendant, who entered her house through an unlocked door. She had never seen him before. He was holding a shotgun with the barrel pointed down. His hand appeared injured. There was a lot of blood on his hands, shirt, and the shotgun.

Herrera tried to hide behind a sofa, but defendant saw her. Defendant walked toward Herrera, raised his shotgun, and pointed it at her stomach. Herrera screamed. Defendant told her not to call the police. Herrera raised her hands and said that nothing would happen. Defendant lowered the shotgun.

Herrera's daughters, Jazmin and Delia, were hiding in the bedroom with Herrera's grandchild. When they heard Herrera's screams, they went into the front room. Defendant walked toward them. They turned around and headed back into the bedroom. Defendant pointed the gun at their feet and told them not to call the police. Jazmin told defendant to calm down, and that they were not going to call the police.

6

Jazmin thought she smelled alcohol on defendant, as if he had been drinking. Delia thought he was drunk because of how he was walking.

Defendant followed Herrera and her daughters into the bedroom and dripped blood on the floor. Jazmin tried to shout through the window at the police. Defendant again said not to call the police.

Defendant looked outside at the police cars. Defendant kept telling them not to call the police because the police wanted to hurt him. Defendant held the gun at his side. Herrera's daughters were crying and scared. Jazmin again told defendant to calm down and said that they would hide him.

As Jazmin spoke to defendant, Delia grabbed Herrera's grandchild, ran to the front door, and screamed to the police, "'He's inside.'" The police approached Herrera's house and defendant looked angry. Jazmin again told defendant that they were going to help him. Defendant eventually placed the gun on the bed.

Herrera immediately grabbed the shotgun and pointed it at defendant. Herrera told the rest of her family to run outside. Herrera ran out of the front door with the shotgun.

**Apprehension of defendant**

About 10 minutes after Officer Garcia had arrived at the scene, several neighbors yelled that the suspect was inside of Herrera's house. Herrera and her family ran outside. They were frightened and yelling. Ms. Herrera was carrying the sawed-off shotgun and dropped it on the ground.

Defendant had left a blood trail along Herrera's fence in the backyard that led into the back door and continued through the house.

The Herreras had left the front door open. The officers could see defendant lying inside the house. The officers approached the front door and ordered him to walk out. Defendant had an injury on his lower arm, and he was bleeding. Defendant did not respond to the officers' commands. The officers entered the house and dragged defendant outside.

Defendant was wearing a white T-shirt and grey sweatpants, and there was blood on his clothes. Officer Garcia smelled a very strong odor of alcohol from defendant's body and breath. Defendant did not have any weapons or ammunition. Defendant was mumbling and incoherent, and said, "'My hand hurts.'" Garcia asked defendant what happened and if he had been shot. Defendant did not respond but asked, "'What happened?'" An ambulance arrived to treat defendant, who had injured his hand when he jumped over the fence and broke into Marquina's house.

**The victim's fatal wound**

Valdez died from injuries to his abdominal aorta and spinal column caused by defendant's second shotgun blast. The entrance wound was in the middle of his back and went directly back to front. There was gunshot residue inside the wound, indicating that it was either a contact wound, or the shotgun was fired within two feet of the victim's body. There was shotgun wadding in his spinal column and multiple pellets spread through the area. There was no exit wound.
Valdez did not have any other wounds on his body, or injuries on his hands, chest, or face.

There was a high level of methamphetamine in Valdez's blood that was 10 times the toxic range.

## The victim's clothing and possessions

Valdez was wearing a black T-Shirt that said "Bulldog Nation." He had tattoos of "007," "Malo" and a small dog paw. The police found a gray baseball cap near Valdez's body, with the letter "B" on the front and back.

Valdez had a pair of metal knuckles, a stun gun, and a small plastic bag with a rock-like substance in his pockets. The stun gun did not fire darts, and required bodily contact to function properly.

## Search around and in 4469 East Nevada

The police found two spent shotgun shell casings and a piece of plastic wadding near Valdez's body, in the front yard of 4469 East Nevada.

The police determined that defendant's first shotgun blast missed Valdez and hit the front window of 4469 East Nevada. The shotgun pellets hit the window's outer frame, shattered the window, and glass fragments were spread around the interior of the front room. The blinds that had covered the front window were also damaged. There were metal fragments on the ground, consistent with shotgun pellets. There were two small holes in the interior wall beyond the front window, indicating that shotgun pellets lodged into the wall.

The police later searched 4469 East Nevada and found live rounds of different calibers, a bulletproof vest, Fresno State Bulldog clothing, a glass jar of marijuana, an empty holster, and a plastic bindle of a substance that appeared to be crystal methamphetamine. There were no firearms found inside.

Esteban Rillo's driver's license was also found inside the house.

## The shotgun

Defendant's weapon, which Herrera seized and dropped on the ground, was a 20-gauge sawed-off shotgun. It was a single shot, break action shotgun. For each shot, the gunman had to pull a lever to break open the barrel, load a single round, close the barrel, cock the trigger, and fire. After it was fired, the gunman had to break open the barrel, remove the expended shell, and reload it again.

When the police retrieved the weapon outside Herrera's house, it was loaded with one live round in the barrel, it was in the locked position, and it was ready to be fired.

The black backpack that defendant dropped on the street contained five live shotgun shells. The live rounds, and the two expended casings found in the front yard, were yellow, had similar Winchester markings, and were for a 20-gauge shotgun.

## Gang Expert

Officer Manuel Romero testified as the prosecution's gang expert. He testified that the Lewis Street and Bond Street gangs are rival subsets of the East Side Fresno Bulldogs. The two gangs had a violent rivalry that involved homicides, assaults, shootings, stabbings, fighting, and "all the way down to just dirty looks."

The homicide scene of East Nevada, Bend, and Barton Streets was within the territory

of the East Side Fresno Bulldogs, but not within the turf of either Lewis or Bond Streets.

Officer Romero testified that if a member dropped out of a validated prison gang, he would be "no good within that gang." The Bulldogs were not as highly structured as the prison gangs, and someone could claim he was inactive or a drop out from the Bulldogs, but "they're still good on the street, meaning other Bulldog gang members are still good with them saying they're a dropout."

The Lewis Street Bulldogs claimed the color red and adopted the logo for the St. Louis Cardinals. Officer Romero testified that when defendant made the arm signal described by Barrera, he was making the "L" sign for the Lewis Street gang.

Officer Romero testified Valdez, the victim, was a validated member of the Bond Street Bulldogs, based on his tattoos of dog paws and "007," and because he was wearing a Boston Red Sox cap. Esteban Rillo was a self-admitted member of the Bond Street Bulldogs.

Officer Romero testified that in 2005 and 2007, defendant said his moniker was "Creeper," and he was an associate with the Bulldogs, but he did not claim a street. Also in 2007, defendant said he only claimed "Bulldog" when he was not with his family.

In 2008 and 2009, defendant admitted he was a validated member of the Lewis Street gang. At that time, defendant had visible tattoos above his left eye for "STL," referring to the St. Louis Cardinals and the Lewis Street gang, and "Fresno" above his right eye."

Officer Romero testified that he read a police report about an investigation in September 6, 2012, where a witness said defendant said the phrase, "Lewis Street."

Dominique Del Toro, the mother of defendant's children, and her brother, Johnny Del Toro, were validated members of the Calwa Street Bulldogs, which was affiliated with the East Side Fresno Bulldogs.

When defendant was arrested in this case in 2013, he claimed that he dropped out of the Lewis Street gang in 2010 for family reasons. Defendant only had tattoos for "Bulldogs" and "ESF" (East Side Fresno) on his back and neck. The facial tattoos had been removed. Officer Romero believed defendant murdered Valdez for the benefit of the Lewis Street Bulldogs, and that he was still an active member of Lewis Street even though he had removed his facial tattoos and claimed to be a dropout, based on his conduct of making the "L" signal and shouting out, "'This is Lewis Street'" and "'Bulldogs'" when he shot Valdez.

**DEFENSE EVIDENCE**

Michael Fitzgerald, an independent consultant on gang activity, testified the Lewis Street and Bond Street sets of the Bulldogs gangs were rivals and attacked each other on sight. Defendant had legitimate reasons for fearing retaliation after dropping out of Lewis Street. He was also in danger if he encountered anyone from the rival Bond Street gang.

**Defendant's trial testimony**

Defendant testified he had been an active member of the Lewis Street subset of the Bulldog criminal street gang. He was placed in the California Youth Authority in 2004. In 2010, defendant was released on parole. He was 25 years old and decided to drop out of the gang. He also started the process of having his numerous gang-related tattoos removed from his face, hands, and neck.

After he dropped out, defendant heard rumors in his neighborhood that he should "watch [his] back" because the members of his former gang might inflict retaliation on him. However, he never experienced any direct confrontations or threats.

Defendant testified that on the day of the homicide, he went to a car wash to raise money for his aunt's funeral. He was carrying a black backpack, and he had a shotgun and shells inside it. Defendant testified that he carried it for his own protection because the car wash was in the Bulldog's territory.

Defendant stopped at a store and bought some beer. He drank 32 ounces of beer before noon. After about a half-hour, defendant left the car wash with an "older ... church lady," whose name he could not recall. She was helping his family arrange his aunt's funeral. They were walking to Anthony Del Toro's house on East Nevada; he was the brother of defendant's girlfriend. Defendant testified he was not wearing any gang-related clothing.

Defendant testified they walked on Bend Street, and he saw his friend, Gina Griffis. He asked Griffis for a ride to Del Toro's house so he could "hurry up and get back to the car wash .... I had the gun on me. I didn't want to be walking and, you know, with the gun. That really is not, you know, a comfortable feeling." Griffis refused to give him a ride.

Defendant and his friend kept walking and saw a group of young men drinking outside Danny Barrera's house. Barrera scowled at him, defendant looked back, and he kept walking. No one yelled anything, but defendant felt uncomfortable. Defendant admitted that he did not think Barrera's group were part of a gang.

### ***Defendant sees the two men in the car***

Defendant testified that as they walked on East Nevada, a brown car drove by them. Two men were inside. The driver was wearing a Boston Red Sox baseball cap, which signified the Bond Street gang, another subset of the Bulldogs. Defendant knew that Bond Street and Lewis Street were rivals, and a member of Bond Street would still "hold the Lewis Street part against" a "dropout."

Defendant testified the driver gave him a "confrontational type stare" and scowled at him. The passenger looked back at defendant "sort of like ... who is this dude, you know, like ... do you know him ...."

Defendant was concerned because the driver in the Bond Street cap exchanged looks with him, and then looked at the passenger. The car continued on East Nevada and defendant lost sight of it because of the trees on the street. Defendant and his friend kept walking. However, the car turned around and drove back toward defendant and his friend.

Defendant testified the brown car pulled up next to him and parked on the street in front of 4469 East Nevada. Defendant did not know or recognize either man, but he later learned Valdez was the driver and Robert Garza (Garza) was the passenger.

### ***Valdez allegedly confronts defendant***

Defendant testified that both Valdez and Garza quickly jumped out of the car. He did not see any guns or knives on either man. Defendant testified that Garza, the passenger, "whistled" and ran down the street. He did not know why Garza whistled but felt it was "an ugly situation."

Defendant testified that Valdez, the driver, did a "quick walk" like he was "jogging."

Valdez stood by the gate to the sidewalk leading to the house. "And he stood in a draw stance, you know, like if he was ready to, you know, whoever this guy was that didn't matter to him, what it looked like, you know what I mean."

### *Defendant fires the first shot*

Defendant testified Valdez did not say anything, and he never saw him with a weapon.

"Q. Okay. And when [Valdez] made a draw stance, what did you do?

"A. When he made a draw stance, sort of like right when they got out [of] the car and they started doing all that running, to me I already knew, you know.

"Q. Well, what did you know?

"A. I just — their actions, the way they did that, you know, them being from Bond Street and them, just their reputation, you know, throughout the years, it was just like, okay, something — most likely more than, you can say, 50 percent is going to happen ...."

Defendant thought they recognized him as someone who was still part of Lewis Street, and he believed a confrontation was about to occur. Defendant expected "the worst," and that they would attack defendant and his friend. Defendant believed that "anything from a physical altercation" could happen, or "what happened maybe in reverse roles, which was the homicide." Defendant told his friend to run away, and she immediately left the area, and he did not see her again.

Defendant testified Valdez was three feet away from him. Garza had run to the corner and was "yelling at the top of his lungs for somebody," and some other guys were running nearby. Defendant felt surrounded.

Defendant testified the shotgun and shells were in his backpack. The zipper on his backpack was broken, and he did not have to open it, "so it wasn't like, you know, I'm sitting there premeditating this, I'm gonna open the zipper and do all this."

Defendant thought Valdez was reaching for something in his pocket. "And at that moment I had already grabbed ... where the shells were in the pocket and I had grabbed the ... handle of the gun. And it's ... like a sword on your side, you know, just sort of slid out. Because the bag was broken. The zipper was broken."

Defendant testified he pulled out the shotgun because he believed "in my heart from my experience being with the gangs that ... these guys were about to ... begin an assault." Valdez stared at him and looked paranoid, frantic, and mean. Valdez looked like he was still trying to pull something out of his pocket. Defendant believed Valdez had a gun and was going to shoot him because Valdez was from Bond Street, which was known for shootings.

Defendant knew there was one round in his shotgun's chamber, but it was not ready to fire. Defendant pulled back the hammer and fired one shot toward Valdez's left side because he "really didn't want to hit the dude." Valdez was about 10 feet away. Defendant did not really aim at Valdez, but he was trying to fire in his direction to let him know that he was armed and to keep them at a distance.

Defendant testified the first shot hit the house. After defendant fired the first shot, Valdez ducked for cover and "kind of" went down, but he was not lying face down. Valdez was on his knees and faced defendant, and he still seemed to be reaching for his waistband.

### *Defendant fires the second shot*

After he fired the first shot, defendant opened the shotgun, ejected the empty shell, "instantly" reloaded, closed the barrel, and pulled back the hammer. Defendant thought there were other guys on the street running toward him. He considered Valdez his main threat and thought he was still trying to reach for something.

Defendant walked toward Valdez because he did not want "to miss again" and fired the second shot. He did not realize that he was shooting into Valdez's back, and believed Valdez must have turned just as he fired.

"Q. So this second shot you wanted to make sure you hit him?

"A. Yes, sir."

Defendant fired the second shot because Valdez "did not look injured. He looked ... sort of like in a military stance .... You see the, you know, the soldiers, you know, like at a ground position," like he was "going for his gun." He "honestly felt" that Valdez had a gun, and "if I would have turned away at any moment it would have gave him that split second to get to it and fire at me."

Defendant testified he did not remember whether he reloaded the shotgun after the second shot.

### *Defendant tries to get help*

Defendant denied that he aimed the shotgun at anyone on the street or in a car. He did not see Avina in his car, denied that he threatened to shoot Mendoza, and could not remember if Mendoza confronted him with his own gun.

Defendant intended to get to a safe place and call the police "and let them know what just happened." He saw Resendiz and tried to run into his house for safety, but Resendiz closed the door. Defendant heard people shouting about where he was, and he ran to Marquina's house and jumped over the gate. He fell down and his head hit the concrete sidewalk. He forced open the back door and went into the house so he could call the police for help. Defendant testified he called 911, but the line was busy. He again heard people outside shouting where he was.

Defendant ran out of the back door, broke through the fence, and got into another backyard. He went into the house through an unlocked backdoor. He encountered Herrera, and told her to call the police because people were trying to jump him. He also told her daughters to call the police. Defendant did not remember pointing the gun at anyone in the house or holding them hostage. The women became hysterical, and he put down the gun to let them know that everything was okay.

Defendant testified he did not see the police outside the house. He again told the women to call the police because there were people trying to get him. The women ran out of the house with the shotgun. He was bleeding, felt sick, and got down on the floor. He did not remember anything until he was in an ambulance. Defendant was taken to the hospital and treated for the injuries on his hand.

Defendant testified he never exchanged words or argued with Valdez and/or Garza. He never saw either man with a weapon.

### **Rebuttal**

Detective Martinez testified that he interviewed defendant at the police department after he was arrested. Defendant was advised of the *Miranda* warnings and agreed to answer questions. The interview occurred at 2:15 a.m. on April 25, 2013, several hours after the homicide. The entirety of the taped interview was played for the jury.

Defendant said he always carried a gun because he had dropped out of the Lewis Street gang. The two men in the car looked at him and jumped out. One man started whistling, calling people, and ran to a house on the corner. Defendant said other men started running down the street toward him. Defendant believed the men in the car were from the Bond Street gang based on their hats, but he did not know them. Defendant decided to pull out his shotgun because he felt his life was in danger and he was not going to let them shoot him.

Defendant said the victim was reaching for something. Defendant fired the first shot to scare him, and the victim fell down. Defendant reloaded and fired the second shot because he was not sure if the first shot hit the man. Defendant asked the officers if the two men in the car were active gang members. The officers said they did not know.

Defendant did not identify the woman that he was walking with and claimed he did not know how to find her. Defendant denied throwing gang signs or calling out the gang's name. Defendant said he jumped the fences and went into the houses to call 911 and the operator for help, but he got busy signals. Defendant denied that he reloaded the shotgun, threatened any of the neighbors, or held a family hostage.

When advised that the neighbors reported a different story, defendant said they were probably from Bond Street and sticking together. Defendant was reminded that the neighbors did not know him or his prior gang affiliation. Defendant said the men in the car knew him.

**Charges, convictions, and sentence**

Defendant was charged with count I, murder of Valdez with the gang special circumstance; counts II, III, and IV, assault with a firearm on, respectively, Annabelle Herrera, Adrian Avina, and Gary Mendoza; and count V, discharging a firearm at the inhabited dwelling on 4469 East Nevada; with gang enhancements as to counts I and V, and that defendant personally used a firearm for all charges except count V (§ 12022.5, subd. (a)).

After a jury trial, defendant was found not guilty of murder in count I, but guilty of the lesser included offense of second degree murder with the firearm enhancement.

Defendant was found guilty of assault with a firearm in counts II and IV, as to Herrera and Mendoza, and that he personally used a firearm; and not guilty in count III as to Avina. He was found guilty of shooting at an inhabited dwelling in count V.

The gang enhancements were found not true.

Defendant was sentenced to 40 years to life, plus nine years four months: as to count I, 15 years to life, plus 25 years to life for the firearm enhancement; as to count II, a consecutive term of three years, plus four years for the firearm enhancement; and as to count IV, a consecutive term of one year, plus one year four months for the firearm enhancement. The court stayed the term for count V.

Hernandez, 2017 Cal. App. Unpub. LEXIS 2352, at *3-33.

**III.    DISCUSSION**

    A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

    B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the

AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    Review of Petition

Petitioner raises the following claims in his petition: (1) Petitioner claims that the trial court's supplemental instruction on provocation misstated California law; (2) Petitioner contends, in his

15

second and third claims, that the prosecutor committed misconduct by (a) arguing the wrong standard for provocation under California law, and (b) making comments during closing argument that undermined the presumption of innocence; and (3) Petitioner argues that trial counsel rendered ineffective assistance by failing to object to the jury instruction on provocation and the prosecutor's argument.

### 1. Jury's Question on Provocation

Petitioner challenges the trial court's supplemental instruction on provocation. Petitioner raised this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

I. The Court Properly Responded to the Jury's Question on Provocation

Defendant was charged in count I with the first degree premeditated murder of Valdez.

The jury was instructed on lawful self-defense, first degree murder, second degree murder, and voluntary manslaughter based on imperfect self-defense.

The jury was also instructed that provocation may reduce a first degree murder to second degree murder and may reduce the offense of murder to manslaughter. During deliberations, the jury asked the court to further define provocation as relevant to this instruction. The court proposed a response, the parties agreed, and the court gave the jury a written instruction in response to its question. Defendant was convicted of second degree murder.

On appeal, defendant contends his defense counsel was prejudicially ineffective for failing to object to the court's special instruction given in response to the jury's question on provocation. Defendant argues the special instruction erroneously stated the applicable law, and defense counsel's failure to object was prejudicial because the erroneous instruction prevented the jury from returning a manslaughter verdict.

We will begin with the applicable legal principles of murder, manslaughter, and provocation, and then review the instructions and the court's response to the jury's question. As we will explain, defense counsel did not render ineffective assistance because the court's response stated the correct legal standard for provocation.

*A. Murder and Manslaughter*

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. [Citation.] ... Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332, 107 Cal. Rptr. 3d 915.)

A defendant who commits an intentional and unlawful killing but lacks malice is guilty of voluntary manslaughter, a lesser included offense of murder. (*People v. Beltran* (2013) 56 Cal.4th 935, 942, 157 Cal. Rptr. 3d 503, 301 P.3d 1120 (*Beltran*); *People v. Rios* (2000) 23 Cal.4th 450, 460, 97 Cal. Rptr. 2d 512, 2 P.3d 1066.) "[A]n intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation [citation], or kills in the unreasonable, but good faith, belief

16

that deadly force is necessary in self-defense. [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59, 82 Cal. Rptr. 2d 625, 971 P.2d 1001.)

*B. Provocation*

Under certain circumstances, premeditation and deliberation may be negated by heat of passion arising from provocation, and reduce first degree murder to second degree murder. Provocation may also reduce an intentional killing from murder to manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101, 108, 96 Cal. Rptr. 2d 441, 999 P.2d 666; *People v. Hernandez, supra*, 183 Cal.App.4th at p. 1332.)

In *People v. Najera* (2006) 138 Cal.App.4th 212, 41 Cal. Rptr. 3d 244 (*Najera*), the court held that the prosecutor in that case incorrectly argued to the jury that "the determination of heat of passion should be based on the defendant's conduct rather than the circumstances in which the defendant was placed." (*Id.* at p. 223.) Instead, *Najera* clarified that "[a]n unlawful homicide is upon 'a sudden quarrel or heat of passion' if the killer's reason was obscured by a '"provocation"' sufficient to cause an ordinary person of average disposition to act rashly and without deliberation. [Citation.] The focus is on the provocation — the surrounding circumstances — and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Ibid.*)

"'[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. *The provocation which incites the defendant to homicidal conduct* in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' The test for adequate provocation is objective. [Citation.]" (*Id.* at p. 225, italics added.)

In *Beltran, supra*, 56 Cal.4th 935, the California Supreme Court reaffirmed *Najera's* standard for provocation and further explained: "A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran* at p. 942, fn. omitted.)

*Beltran* rejected the People's argument that provocation "would require a finding not only that an ordinary person of average disposition would be liable to act rashly and without reflection, but that such a person would act rashly in a particular manner, *namely, by killing*." (*Beltran, supra*, 56 Cal.4th at p. 942, italics added.)

"Nearly one hundred years ago, this court explained that, when examining heat of passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion ... to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from

judgment.' [Citation.] The proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment." (*Id.* at pp. 938-939, 948.)

"Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran, supra*, 56 Cal.4th at p. 949, italics in original.)

*Beltran* further held that the relevant standard "is an objective one," and that "'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.'" (*Beltran, supra*, 56 Cal.4th at p. 950.) "'[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter ....' [Citations.] Thus, it is insufficient that one is provoked and later kills. If sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored," there is "no mitigation for a subsequent killing." (*Id.* at p. 951.)

With this background in mind, we turn to the instructions given in this case.

*C. The Instructions*

As to count I, first degree premeditated murder, the jury was instructed on homicide (CALCRIM No. 500), lawful self-defense (CALCRIM No. 505), first and second degree murder, and express and implied malice (CALCRIM Nos. 520, 521).

During the instructional phase, the court stated that it would give CALCRIM No. 522 on provocation. Neither party objected or asked for any modifications to the instruction. The jury was correctly instructed as follows:

"Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance ... of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The jury was instructed on voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571).

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. The defendant acted in imperfect self-defense if: One, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; and two, the defendant actually believed that the ... immediate use of deadly force was necessary to defend against the danger; but, three, at least one of

18

those beliefs was unreasonable.

"Belief in a future harm is not sufficient no matter how great or how likely the harm is believed to be. In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant. If you find the defendant knew that Bernardo Valdez had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs."

D. *CALCRIM No. 570; Instruction Not Given*

Also during the instructional phase, the court reviewed the homicide instructions and stated that neither party requested the instruction for voluntary manslaughter based on the alternate theory of sudden quarrel or heat of passion. The court further stated: "... I don't think it applies, heat of passion. The only theory for voluntary manslaughter that the Court sees is imperfect self-defense." Defense counsel agreed, and the jury did not receive CALCRIM NO. 570.

The jury thus *was not* instructed on voluntary manslaughter based on the alternate theory of sudden quarrel or heat of passion, as set forth in CALCRIM No. 570. We quote the instruction because the court and the parties later considered it to decide how to respond to the jury's question about provocation. CALCRIM No. 570 states in relevant part:

"*A killing that would otherwise be murder is reduced to voluntary manslaughter* if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"*It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.*"

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." (Italics added.)

E. *The Jury's Question About Provocation*

The jury began deliberations on the morning of Monday, February 10, 2014. Just before noon on February 11, 2014, the jury sent the following question to the court:

19

"[CALCRIM No.] 522 presents 'provocation' as a factor in deciding 1st or 2nd degree murder or manslaughter. We have some confusion re the definition of 'provocation' and issues around provocation to the defendant vs. provocation to a 'normal' reasonable citizen w/no gang background. Can you provide any guidance to help us?"

The court conducted a hearing outside the jury's presence on the possible response to this question. Defense counsel said he had reviewed the instructions and could only find a definition for provocation in CALCRIM No. 570, on sudden quarrel or heat of passion as the alternate theory for voluntary manslaughter. Defense counsel was hesitant to use that definition because the instruction addressed a crime of passion, and that was not at issue in this case.

The court reviewed the definition of provocation in *Najera, supra*, 138 Cal.App.4th 212, as set forth above. Defense counsel agreed that CALCRIM No. 570 stated the definition in *Najera*. The court asked the parties if it should reply to the jury's question based on the definition of provocation in *Najera* and CALCRIM No. 570. Defense counsel agreed. The prosecutor asked the court to read the proposed special instruction aloud. The court said:

"*The provocation which incites the defendant to homicidal conduct in the heat of passion* must be caused by the victim or be conduct reasonably believed by the defendant to have been engaged in by the victim. The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation or reflection. The test for adequate provocation is objective." (Italics added.)

Defense counsel said he was concerned about the phrase "heat of passion." The court agreed to delete it and commented: "In retrospect, I probably shouldn't have given this [referring to the provocation instruction], but I did. So now here's where we are."

Defense counsel asked the court to modify the last phrase so that it said the conduct must be sufficiently provocative that it would cause "a person of average disposition in the same situation and knowing the same facts" to act rashly or without due deliberation.

The court agreed, prepared a printed response to the jury's question, and asked the attorneys to review it. Both the prosecutor and defense counsel agreed to the court's response to the jury's question.

*F. The Court's Response to the Jury*

The court sent the following written response to the jury:

"*The provocation which incites the defendant to homicidal conduct* must be caused by the victim, or be conduct reasonably believed by the defendant to have been engaged in by the victim. The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. The test for adequate provocation is objective.

"The defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed

20

to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted rashly and without due deliberation rather than from judgment." (Italics added.)

The jury did not ask another question about provocation.

*G. Additional Jury Question and Verdict*

The jury later asked the court for further clarification of the definitions of willfulness and deliberation, and whether it should consider "the mindset of a reasonable person, or the mindset of the defendant." After consulting with the parties, the court referred the jury to CALCRIM No. 521, which defined those terms, and that "taken as a whole, [it] indicates it is the <u>defendant</u> who must deliberate." (Original underline.)

Defendant was found not guilty of first degree murder, but guilty of second degree murder as a lesser included offense with the firearm allegation found true.

*H. Analysis*

Defendant relies on the definitions of provocation in *Najera* and *Beltran*, and argues that the first sentence in the court's special instruction in response to the jury's question was erroneous and misleading because it referred to "provocation *which incites the defendant to homicidal conduct* ...." (Italics added) Defendant argues this phrase "improperly suggested that the provocation must be sufficient to cause someone to kill another. The jury should have been informed only that the provocation would cause someone to act under the influence of an intense emotion 'that causes a person to act without due deliberation and reflection,'" as stated in CALCRIM No. 570. Defendant argues the instructional error was prejudicial because it prevented the jury from finding defendant guilty of only voluntary manslaughter.

1. Failure to Object

We first note that defendant did not object to the court's special instruction. While defense counsel made suggestions to the court's proposed response, he ultimately agreed with the court's instruction. Defendant acknowledges that counsel did not object, but asserts this court may still review the special instruction because it violated his substantial rights. A defendant's failure to object to an alleged instructional error "forfeits the objection on appeal unless the defendant's substantial rights are affected. [Citations.] 'Substantial rights' are equated with errors resulting in a miscarriage of justice under *People v. Watson* [1956] 46 Cal.2d 818, 299 P.2d 243 ...." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465, 78 Cal. Rptr. 3d 855.)

Defendant also contends this issue may be reviewed because his attorney was prejudicially ineffective for failing to object to the special instruction. "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 215, 66 Cal. Rptr. 2d 123, 940 P.2d 710.)

2. *Beltran*

Under either course of review, the entirety of the trial court's special instruction was legally correct and followed closely the definitions set forth in *Najera* and *Beltran* - that the provocative conduct "'must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.'" The test is objective, the defendant must have acted under the direct and immediate influence of provocation, and defendant cannot set up his own standard of conduct. (*Najera, supra*, 138 Cal.App.4th at pp. 224-225; *Beltran, supra*, 56 Cal.4th at p. 949-950.) The trial court stated, "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted rashly and without due deliberation rather than from judgment."

*Beltran* rejected the People's argument that when a defendant relies on provocation to reduce a murder to voluntary manslaughter, the jury had to find "that an ordinary person of average disposition would *kill*." (*Beltran, supra*, 56 Cal.4th at p. 949, original italics.) *Beltran* explained that the proper focus "*is placed on the defendant's state of mind, not on his particular act*. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Ibid.*, first italics added, second italics in original.) *Beltran* further explained heat of passion mitigates culpability for a killing "but does not *justify* it.... [I]f one *does* kill in this state, his punishment is mitigated. Such a killing is not justified but *understandable* in light of 'the fraility of human nature.' [Citation.] The killing reaction therefore is the *extraordinary* reaction, the unusual exception to the general expectation that the ordinary person will not kill even when provoked." (*Ibid.*, italics in original.)

The introductory phrase used in the trial court's special instruction to the jury in this case did not contradict *Beltran's* holding, but instead clarified the disputed question — whether provocation would reduce the defendant's homicidal act from the charged offense of first degree murder to manslaughter. The trial court adopted the phrase from *Najera*, which in turn quoted the phrase from the California Supreme Court's opinion in *People v. Lee, supra*, 20 Cal.4th 47:

"Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which *incites the defendant to homicidal conduct in the heat of passion* must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*Id.* at p. 59, italics added.)

Indeed, the California Supreme Court has repeatedly used this phase to define provocation, both before and after *Najera* and *Beltran*. (See, e.g., *People v. Moye* (2009) 47 Cal.4th 537, 549-550, 98 Cal. Rptr. 3d 113, 213 P.3d 652; *People v. Verdugo* (2010) 50 Cal.4th 263, 293, 113 Cal. Rptr. 3d 803, 236 P.3d 1035; *People v. Butler* (2009) 46 Cal.4th 847, 868-869, 95 Cal. Rptr. 3d 376, 209 P.3d 596; *People v. Souza* (2012) 54 Cal.4th 90, 116, 141 Cal. Rptr. 3d 419, 277 P.3d 118; *People v. Manriquez* (2005) 37 Cal.4th 547, 583, 36 Cal. Rptr. 3d 340, 123 P.3d 614.)

In *People v. Nelson* (2016) 1 Cal.5th 513, 205 Cal. Rptr. 3d 746, 376 P.3d 1178, the court again recited this definition of provocation, and held the defendant's claim that the victim's comments aroused his passions and provoked him "fails because '"[t]he provocation which *incites the defendant to homicidal conduct* in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim."' [Citation.] Moreover, even if we assumed [the

22

victim's] comments incited [defendant], that incitement must be objectively sufficient "'to arouse the passions of the ordinarily reasonable man.'" [Citation.]" (*Id.* at p. 540, italics added.)

The trial court's special instruction did not misstate the law, contradict *Beltran*, or mislead the jury.

3. Closing Argument

Defendant argues the alleged instructional error on provocation was exacerbated by the prosecutor's rebuttal argument. Neither the prosecutor nor defense counsel addressed provocation in their initial closing arguments. The prosecutor argued defendant was guilty of first degree premeditated murder based on the eyewitness accounts that he fired the second shot directly into the prone victim's back, and defendant's trial testimony was not credible. Defense counsel argued that it was reasonable for defendant to fear for his life given his past gang history and focused on self-defense and justifiable homicide, and voluntary manslaughter based on imperfect self-defense.

In rebuttal, the prosecutor argued defendant's alleged belief that he had to use deadly force was unreasonable "because the danger was not imminent" since the victim never displayed or had a weapon. The prosecutor addressed provocation for the first time:

"And there's no provocation. And that's what in a lot of ways makes this case easier for you to decide. Think about all the different possibilities that could have existed if [the victim] had lunged towards the defendant. There's no evidence of that. If [the victim] had pulled out a knife or a gun, that would be different. He didn't. At the time he died he was face down with his back to the defendant."

The prosecutor asserted the victim may have been withdrawing into the house, and was not capable of inflicting any injury to defendant once he was on the ground.

"Even the defendant admitted it's possible [the victim] was just running away. [The victim] was running for his life. And that first shot almost caught him in the head.

"*Not manslaughter, because this defendant was not provoked. Even if somewhat provoked, you have to ask yourself, person of average disposition would have decided to kill.*

"And the law says the defendant — and that's really what I suggest to you is the proposition on behalf of the defendant, that he wants to set his own standard of conduct. And the law says no. Follow the law." (Italics added.)

Defendant cites to the italicized section above, and asserts the prosecutor misstated the law as set forth in *Beltran*, that provocation only required that a person be influenced by a strong emotion and not provoked to kill. (See, e.g., *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1084-1086, 212 Cal. Rptr. 3d 848.) The entirety of the prosecutor's rebuttal argument, taken in context, did not misstate the definition of provocation. More importantly, the prosecutor's argument occurred *before* the jury's question to the trial court. Thus, to the extent the jury may have been confused about the issue, the court's special instruction correctly clarified the definition of provocation. "The jury asked for additional guidance and the trial court gave it. It was not reasonably probable that the jury here was misled to defendant's detriment." (*Beltran, supra,* 56 Cal.4th at pp. 955-956.)

<u>Hernandez</u>, 2017 Cal. App. Unpub. LEXIS 2352, at *33-54.

23

*a.*    *Legal Standard and Analysis*

It is well-settled that federal habeas relief is not available to state prisoners challenging state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings).  Although Petitioner attempts to claim a violation of his constitutional rights, he does not point to any federal authority which holds that the instruction complained of herein violates the Constitution.  Rather, he challenges the trial court's supplemental instruction on provocation.  Such challenge does not give rise to a federal question cognizable on federal habeas review.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").  Thus, the claim is not cognizable on federal habeas and should be rejected.

Even if the Court finds the claim cognizable, it is without merit. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson,

507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." <u>Id</u>. (citation omitted); <u>see</u> <u>Calderon v. Coleman</u>, 525 U.S. 141, 146-47 (1998).

Petitioner's claim does not merit relief. He fails to establish that the trial court's special instruction violated California law, let alone the Constitution. As noted by the Fifth DCA, the entirety of the trial court's special instruction was legally correct. <u>Id</u>. at *49. Additionally, as Respondent argues, Petitioner fails to cite any evidence that would lead the jury to believe the victim provoked the Petitioner, therefore, any error was harmless. (Doc. 21 at 36.) Petitioner fails to establish that the state court's determination was contrary to or an unreasonable application of Supreme Court authority. The claim should be denied.

### 2. Prosecutorial Misconduct

Petitioner contends in his second and third claims that the prosecutor committed two acts of prejudicial misconduct during closing argument by (1) misstating the definition of provocation in violation of <u>Beltran</u> in his rebuttal argument; (2) undermining the presumption of innocence in both his initial and rebuttal arguments. In the last reasoned decision, the Fifth DCA denied the claims as follows:

II. Prosecutorial Misconduct

Defendant next contends the prosecutor committed two acts of prejudicial misconduct during closing argument by (1) misstating the definition of provocation in violation of *Beltran* in his rebuttal argument; (2) undermining the presumption of innocence in both his initial and rebuttal arguments.

*A. Failure to Object*

We begin with the well-settled law on prosecutorial misconduct. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202, 17 Cal. Rptr. 3d 532, 95 P.3d 811.)

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.

[Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447, 3 Cal. Rptr. 2d 106, 821 P.2d 610; *People v. Silva* (2001) 25 Cal.4th 345, 373, 106 Cal. Rptr. 2d 93, 21 P.3d 769.)

Defense counsel did not make prosecutorial misconduct objections or request admonitions to the two instances which defendant now raises on appeal, and counsel's failure to object precludes his appellate claims of misconduct. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000, 108 Cal. Rptr. 2d 291, 25 P.3d 519; *People v. Cain* (1995) 10 Cal.4th 1, 48, 40 Cal. Rptr. 2d 481, 892 P.2d 1224.)

Defendant acknowledges defense counsel failed to object to these two aspects of misconduct in closing argument, and alternatively argues counsel was prejudicially ineffective for failing to preserve the objections. We thus turn to the merits of defendant's claim.

*B. Alleged Misstatements Regarding Provocation*

As discussed in issue I, *ante*, defendant argues the alleged error in the court's special instruction was exacerbated by the prosecutor's rebuttal argument because he misstated the definition of provocation in violation of *Beltran*. Defendant cites to this same section of argument and further asserts the prosecutor committed prejudicial misconduct by allegedly misstating the definition of provocation in his rebuttal argument.

As we have already explained, the entirety of the prosecutor's rebuttal argument was not misleading, and the court's special instruction correctly stated the applicable law, and thus, clarified any possible confusion. Defense counsel was not prejudicially ineffective for failing to object to the prosecutor's rebuttal argument about provocation.

*C. Presumption of Innocence*

Defendant next claims that the prosecutor used his closing argument to undermine the constitutional presumption of innocence. In reviewing claims of misconduct during closing argument, "we must view the statements in the context of the argument as a whole. [Citation.]" (*People v. Cole, supra*, 33 Cal.4th at p. 1203.)

In his initial closing argument, the prosecutor argued defendant was guilty of first degree murder because he fired the first shot at the victim's head, realized he missed, ejected the expended shell, reloaded the shotgun, and fired the second shot directly into the center of the victim's back. The prosecutor noted the neighbors who saw the shooting consistently described defendant as stepping forward and firing the second and fatal shot into the victim's back while he was lying face down on the ground. He also cited the neighbors' testimony about how defendant threatened them with his loaded shotgun when he realized they had seen the murder.

The prosecutor asserted defendant did not have any credibility when he claimed that he never threatened any of the neighbors or tried to get them to call the police to help them. Instead, the neighbors' testimony that he threatened them and ordered them not to call the police was more credible because they were complete strangers to defendant and had no reason to fabricate their testimony. Defendant also lacked credibility when he claimed to have felt threatened by the victim.

"I would suggest to you it was somewhat curious the defendant used the term a western stance, because there are other things that happen in the old west. People got shot in the back. This wasn't a gunfight. This was more akin to an execution. He got shot in the back."

The prosecutor advised the jury that "*no one tells you to check your common sense at*

26

*the door. When you're going through these instructions, use your common sense.*" (Italics added.) "And the most obvious fact, the most powerful fact I would suggest to you, [defendant] shot him in the back."

The prosecutor concluded his initial argument as follows:

"*Every defendant has the right to this process, even the most guilty. Every defendant who stands accused of a crime has the right to a capable and experienced attorney, has the right to have a judge decide matters of law, has the right to have citizens from his own community to be selected, chosen to hear the evidence and decide matters of fact, even the most guilty. Just use your common sense. I'm appealing to your common sense. Follow the law.*" (Italics added.)

In rebuttal, the prosecutor again disputed the credibility of defendant's account compared to the testimony of the eyewitnesses, and described the homicide as "a targeted execution." Defendant's alleged belief that he had to use deadly force was unreasonable "because the danger was not imminent" since the victim never displayed a weapon. The prosecutor concluded by discussing the People's burden of proving the elements of the charges offenses beyond a reasonable doubt.

"Beyond a reasonable doubt is an abiding conviction that the charge is true and what I would suggest to you what that means, when this case is over and you're released from your obligations as jurors in this case and you finally get to talk about this case with your friends and family ... and you can tell them, Yes, I was on his knowledge in a very serious case, and this was the evidence. I voted guilty on that day and I believe beyond a reasonable doubt that he was guilty and all these days and weeks and months later I still believe he's guilty. I abide by my decision. I have an abiding conviction in the truth of those charges. That's beyond a reasonable doubt.

"*Everyone is entitled to this process, even the most guilty*. And based on the evidence that you heard in this case I am asking you to return verdicts of guilty for Counts 1 through 5 ...." (Italics added.)

*D. Analysis*

Defendant cites to the italicized portions of the prosecutor's initial and rebuttal arguments, and asserts he undermined the presumption of innocence and the People's burden of proof by asking the jury to use its "common sense," and asserting that even the "most guilty" are entitled to due process. We find that in both instances, defense counsel was not prejudicially ineffective for failing to object because the prosecutor did not commit misconduct.

1. "Common sense"

The prosecutor did not commit misconduct when he advised the jurors to use their "common sense." The prosecutor made these comments in the midst of arguing that defendant's version of events was not credible, his story was refuted by the other witnesses, and "the most obvious fact, the most powerful fact I would suggest to you," to show that he was not credible was because defendant "shot him in the back." Indeed, the prosecutor's argument was nearly identical to CALCRIM No. 226 as given in this case:

"You alone must judge the credibility and believability of the witnesses. In deciding whether testimony is true and accurate, *use your common sense and experience*. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part or none of any witness' testimony.

Consider the testimony of each witness and decide how much of it you believe." (Italics added.)

"To tell a juror to use common sense and experience is little more than telling the juror to do what the juror cannot help but do. In approaching any issue, a juror's background, experience and reasoning must necessarily provide the backdrop for the juror's decision making, whether instructed or not. CALCRIM No. 226 does not tell jurors to consider evidence outside of the record, but merely tells them that the prism through which witnesses' credibility should be evaluated is common sense and experience. ... CALCRIM No. 226 does not instruct jurors to use their common sense and experience in finding reasonable doubt, which could potentially conflict with the beyond a reasonable doubt standard, but only in assessing a witnesses' credibility." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1240, 67 Cal. Rptr. 3d 904.)

The prosecutor did not misstate the reasonable doubt standard, equate the reasonable doubt standard with common sense, or attempt to undermine the People's burden of proving defendant's guilt beyond a reasonable doubt. Instead, the prosecutor properly urged the jury to use common sense in determining whether defendant's claim that he felt threatened by the victim was credible, when compared to the testimony of the witnesses that defendant shot the prone victim in the back. (See, e.g., *People v. Romero* (2008) 44 Cal.4th 386, 416, 79 Cal. Rptr. 3d 334, 187 P.3d 56 [prosecutor's argument urging jury "to 'decide what is reasonable to believe versus unreasonable'" and to "'accept the reasonable and reject the unreasonable'" did not lessen prosecution's burden of proof].) The prosecutor did not urge the jury to use its common sense as a substitute for evidence of defendant's guilt. (Cf. *People v. Centeno* (2014) 60 Cal.4th 659, 671-672, 180 Cal. Rptr. 3d 649, 338 P.3d 938 [argument urging jury to accept what was reasonable but not informing the jury it must be convinced that all the necessary facts were proven beyond a reasonable doubt lessened the People's burden of proof because it "left the jury with the impression that so long as [the prosecutor's] interpretation of the evidence was reasonable, the People had met their burden."].)

2. "Most Guilty"

The prosecutor also did not commit misconduct or undermine the presumption of innocence when he argued that even the "most guilty" are entitled to due process of law.

"When arguing to the jury, it is misconduct for a prosecutor to express a personal belief in the defendant's guilt if there is a substantial danger that the jurors will construe the statement as meaning that the belief is based on information or evidence outside the trial record [citation], but expressions of belief in the defendant's guilt are not improper if the prosecutor makes clear that the belief is based on the evidence before the jury [citation]." (*People v. Mayfield* (1997) 14 Cal.4th 668, 781-782, 60 Cal. Rptr. 2d 1, 928 P.2d 485, abrogated on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 188 Cal. Rptr. 3d 328, 349 P.3d 1028.)

In *People v. Frye* (1998) 18 Cal.4th 894, 77 Cal. Rptr. 2d 25, 959 P.2d 183 (disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 87 Cal. Rptr. 3d 209, 198 P.3d 11), the court rejected a similar claim of misconduct. At the end of the guilt phase in a capital case, the prosecutor asserted in closing argument that "'the long road of the trial is almost done, in this phase anyway.'" Defendant argued such argument "impermissibly communicated to the jury [the prosecutor's] belief that the penalty phase of trial would occur because a guilty verdict was inevitable." (*Frye, supra*, at p. 975.) *Frye* disagreed:

"A prosecutor may not give a personal opinion or belief as to the defendant's guilt if it will suggest to the jury the prosecutor has information bearing on guilt that has not been

disclosed at trial. [Citations.] However, a prosecutor is permitted to offer an opinion on the state of the evidence. [Citation.] This is precisely what occurred here. There was no misconduct." (*Id.* at pp. 975-976.)

In *People v. Lopez* (2008) 42 Cal.4th 960, 71 Cal. Rptr. 3d 253, 175 P.3d 4, the prosecutor argued that defense counsel's examination of witnesses helped the People's case because it showed the credibility and consistency of the witnesses' testimony, and "'*I don't think [defense counsel] is mean or stupid. But I think his client is guilty....*'" (*Id.* at pp. 970-971, italics added in original.) *Lopez* rejected the defendant's argument that the prosecutor expressed her personal opinion in his guilt, or that her belief was based on evidence not presented at trial. "To the contrary: Because [the prosecutor's] statement that she believed defendant was guilty immediately followed her comment that, in her view, defense counsel's cross-examination of the victim's demonstrated that they were credible, a reasonable juror would most likely infer that the prosecutor based her belief in defendant's guilt on the credibility of the victims' testimony at trial." (*Id.* at p. 971; see also *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057-1058, 17 Cal. Rptr. 2d 174, 846 P.2d 756 [it was not inappropriate for prosecutor to argue "'that's the best case I've ever seen in any case I've ever prosecuted of intentional misrepresentation and consciousness of guilt'"], overruled on other grounds in *Stansbury v. California* (1994) 511 U.S. 318, 325-326, 114 S. Ct. 1526, 128 L. Ed. 2d 293; *People v. Rich* (1988) 45 Cal.3d 1036, 1092, 248 Cal. Rptr. 510, 755 P.2d 960 [prosecutor made appropriate comment on the evidence by arguing that "'I have never seen deliberation and premeditation like that.'"].)

In this case, the prosecutor similarly did not undermine defendant's presumption of innocence or imply that he was relying on evidence outside the trial record to assert that defendant was guilty. Instead, he explained that defendant was entitled to due process, but that the evidence showed he was guilty of murder because defendant's story was undermined by the witnesses, and carefully explained the People's burden of proof beyond a reasonable doubt.

"We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions. [Citations.]" (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119, 171 Cal. Rptr. 3d 774.) The entirety of the instructions clearly informed the jury that the prosecution had the burden of proving defendant guilty beyond a reasonable doubt; that the jury had to find defendant not guilty unless the evidence showed he was guilty beyond a reasonable doubt (CALCRIM No. 103); and that the jury had to follow the law as the court explained it, even if the jurors believed the attorney's comments conflicted with the court's instructions on the law (CALCRIM No. 200).

The nature of the verdicts show that the jury understood the presumption of innocence and the People's burden. Defendant was charged with counts II, III, and IV, assault with a firearm on, respectively, Annabelle Herrera, Adrian Avina, and Gary Mendoza. The information also alleged gang enhancements as to count I, murder, and count V, discharging the firearm at an inhabited dwelling. The jury found defendant not guilty of assault on Avina, but guilty of the assaults on Herrera and Mendoza; and found all the gang enhancements not to be true. The verdicts thus indicate the jury carefully reviewed the evidence and found reasonable doubts whether defendant aimed the gun at Avina, and committed the crimes for the benefit of a gang.

Hernandez, 2017 Cal. App. Unpub. LEXIS 2352, at *54-66.

    *a.*    *Legal Standard*

29

To merit habeas relief for allegations of prosecutorial misconduct, "it is not enough that" the petitioner demonstrates that the prosecutor's "remarks were undesirable or even universally condemned," Darden v. Wainwright, 477 U.S. 168, 181 (1986); a petitioner must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson v. Borg, 74 F.3d 1571, 1577 (9th Cir 1996) (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

   *b.*    *Analysis*

The Fifth DCA found that "the entirety of the prosecutor's rebuttal argument was not misleading, and the court's special instruction correctly stated the applicable law and, thus, clarified any possible confusion." Hernandez, 2017 Cal. App. Unpub. LEXIS 2352, at *56. Additionally, "[a] jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). The Fifth DCA's rejection of the claim, based upon the clarification provided by the trial court, was reasonable.

Additionally, the Fifth DCA rejected the claim regarding the prosecutor undermining the defendant's presumption of innocence. Hernandez, 2017 Cal. App. Unpub. LEXIS 2352, at *65. The Fifth DCA explained that the prosecutor stated that Petitioner was entitled to due process and explained the burden of proof. Id. The Fifth DCA stated that "[t]he entirety of the instructions clearly informed the jury that the prosecution had the burden of proving defendant guilty beyond a reasonable

30

doubt; that the jury had to find defendant not guilty unless the evidence showed he was guilty beyond a reasonable doubt (CALCRIM No. 103); and that the jury had to follow the law as the court explained it, even if the jurors believed the attorney's comments conflicted with the court's instructions on the law (CALCRIM No. 200)." Id. at *65-66. The jury is presumed to follow its instructions, and in this case, there is no indication the jury failed to do so.

The Fifth DCA's determination was not unreasonable. From the record, a fairminded jurist could conclude that the prosecutor's statements could not reasonably be seen as "infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. The claim should be denied.

### 3. Ineffective Assistance of Counsel

Petitioner alleges in his last claim that counsel was ineffective for failing to object to the jury instruction on provocation and to the prosecution's argument.

#### a. *Legal Standard*

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d

1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

*b.* *Analysis*

As Respondent notes, the Fifth DCA rejected Petitioner's derivative ineffective assistance of counsel claims, for failing to object to the jury instruction on provocation and to the prosecutor's arguments, discussed in the previous claims. (Doc. 21 at 44-45.) The Fifth DCA specifically found that "defense counsel did not render ineffective assistance because the court's response stated the correct legal standard for provocation," and regarding objecting to prosecutor's arguments, the Fifth DCA found that "defense counsel was not prejudicially ineffective for failing to object because the prosecutor did not commit misconduct." Hernandez, 2017 Cal. App. Unpub. LEXIS 2352, at *34, *60. The state court reasonably determined that Petitioner suffered no prejudice. It is entirely speculative that any objections by counsel would not have been futile. Moreover, Petitioner failed to demonstrate that there is a reasonable probability that objection to the court's instruction or the prosecutor's arguments would undermine confidence in the outcome of the trial. Petitioner failed to show that counsel erred or that the error resulted in any prejudice. The claim should be rejected.

**IV.    RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

///

///

///

///

///

The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **September 17, 2019**          **/s/ Jennifer L. Thurston**
                                                                      UNITED STATES MAGISTRATE JUDGE